Welcome, counsel. We'll now start with Clinton v. Security Benefit Life 21-3035. Mr. Friedman, are you around? Looks like you are. Yes, hello. Okay, you may proceed. Thank you very much. May it please the court, I represent the plaintiffs in this case. The dismissal order should be reversed because plaintiff's complaint plausibly alleges with sufficient particularity that Security Benefit engaged in a fraudulent scheme to sell its annuities through misrepresentations and half-truths. Mr. Friedman, can I ask you a threshold question about the finality of the order on review? Yes. So plaintiffs chose not to take the district court up on its invitation in footnote 14 to seek leave to amend pursuant to the local rule. Did that render somehow the district court's order non-final the way that the court understood the procedural posture of things? No, Your without prejudice. Under prevailing 10th Circuit law, where a dismissal without prejudice disposes of the entire action, that is a final appealable decision. So we had an election to make. Do we file a new complaint, having already been through the system for two years, or do we resolve in its entirety the case below under this court's decision in the Constian case, as well as the Moya case, that rendered the opinion to be final and appealable? So plaintiffs assert that Security Benefit used misleading uniform marketing materials, sales illustrations, and standardized statements of understanding, which are 25-page documents provided at the time of sale that are signed by the customers and the agent, representing that these particular annuities provided the opportunity for uncapped favorable returns if the purchasers allocated their premiums to certain proprietary indices that were developed by Security Benefit and had no established track record whatsoever. And the complaint identifies with particularity the marketing materials, the statements of understanding, and the sales illustrations, including quotations and in some instances screenshots, showing the actionable misleading statements and omissions. The marketing materials and the illustrations depicted very favorable returns, as high as 38% for Plaintiff Weber over a five-year period, based upon these proprietary indices, like the annuity-linked Trader Vic index that SPL Security Benefit designed and launched when the annuities were introduced. These indices had no historical track record because they did not exist during a 10-year period used to project the depicted results. In fact, there's no reason why any consumer would allocate hundreds of thousands of dollars, as these plaintiffs did, to an equity-linked annuity with an index they'd never heard of and had never been created, absent the alleged misrepresentations inducing the purchases. Now, the complaint alleges detailed facts showing how and why Security Benefit knew that these indices would not and could not produce the results depicted in the marketing materials and illustrations. That strikes me as strange because there's an old economics adage, if it happens, it's possible. And here you have, as I recall, as far as I understand, there were several illustrations. Some showed high rates of return. At least one illustration showed a zero rate of return, as I recall. But these were for different periods of time, saying that if that index had been in effect during that period of time, this would have been your rate of return. And so when you say that those returns are impossible, you're saying that circumstances that led to that high rate of return in the past, if they had used that index, can't be replicated, can't be reproduced in the future? Yes. Let me break it down for you, Your Honor. First, you say if it's possible, it can happen. First, you have the actual performance. The 10-year benchmark lookback period that was used showed constantly increasing returns. None of the illustrations based upon the lookback represented anything close to a zero return. They ranged from 30 to 38 percent, regardless of what scenario you're talking about. Immediately upon the launch of the annuities, the index tanked, and it was zero. And the returns remained zero for literally 10 years. Regardless of whether the markets went up, the index was zero, and the returns were zero. Regardless of whether the market went down, the returns were zero. And there's been no alternative explanation for how you could have a product designed to show these outsized returns that in reality produced zero returns for an extended period, regardless of prevailing market conditions. Now, under the prevailing law, including Twombly and Iqbal, plaintiffs are entitled to inferences in our favor. And the actual performance, which is undisputed based upon publicly reported reports, is zero. Now, is there, was there a to compute these illustrations, they had to say this is the index that's been created. If we apply that index to the market for the prior 10 years, this is what would have happened. Was that calculation false? We allege, I'm sorry, we allege that the assumptions used were erroneous and known to be so by security benefit. In addition to the actual performance. Well, I thought when you said the assumptions, I thought it was based on this index measures certain, the values of certain stocks in the past. Where are their assumptions involved in the illustrations? Didn't they just say, this is what gold did, this is what these stocks did, this was what this other investment did. And so under that index, given those facts about the market in the past 10 years, this index would have reached this number. We have obviously had no discovery, so we can't look into the calculations that were actually done. But we do know that the 10 year look back period itself has been condemned by regulators, as well as by commentators as being an unrepresentative, non-representative benchmark to use to make these projections. The NAIC, the National Association of Insurance Commissioners has passed a model regulation saying that you can't make these projections and illustrations unless the index has been in existence for 20 years. Because a 10 year look back is by itself non-representative. In addition, there are certain features that were identified and alleged with specificity that show that this index and these indices could not perform as represented due to the excess return nature of the underlying index. What I mean by that, Your Honor, is that the linked index, the excess return Trader Vic index, deducts a risk-free rate right off the top. In addition, they could not perform as illustrated because there was something called volatility control overlay, which operates to further suppress returns, and there were a host of additional sales charges and loads. So we're not... So what was this, but the illustrations were illustrations of what would happen just with the index. An investor in this type of annuity would have other expenses assessed against it that would reduce the return significantly. But those adjustments that would reduce the return were disclosed in the materials received by the investors, were they not? No, certain of them were. First of all, the illustrations do not show just the index. They show what the investor should earn after applying all of these charges, and several of them were not disclosed inadequately, if at all, in the SOUs or the marketing materials. For example... I'm sorry. So the illustrations were labeled as this is what you an investor would get after all adjustments and costs and so on? The illustrations were shown in numerical sequence as to what projected returns would be based upon certain conditions. They do not guarantee that this is what you will get, but they represent that this is a fair feature. The initial haircut resulting from deduction of a risk-free rate is not disclosed anywhere in the SOU, nowhere in the marketing materials. The volatility... Is it mentioned in any of the materials that the investors receive? The only thing that is mentioned is that it's based... And the SOUs are the critical document because every purchaser received and signed an SOU. The SOUs say this is based upon the excess return trader vic index. Now, an uninformed consumer with an excess return means it's providing excess returns. There's no disclosure or description of what that means. There's no disclosure that a risk-free rate is deducted from the performance. There's no disclosure whatsoever concerning the operation or excess return nature of the underlying linked index. Furthermore, the SOUs go on to say falsely that the volatility control feature, which is used to control volatility as itself a redundant unnecessary feature, would allow that these indices would allow people to earn a positive rate of return when bond or equity markets were down. And again, if you look at the history and the charts that are set forth in the complaint in our submissions, again, at no time when the equity markets were down did the index provide or produce any return to the annuity holders. When markets were up, it was at zero. When markets were down, it was at zero. And there's been no alternative explanation by security benefit or by the district court for any other interpretation or inference that this flatline, which if this were a heart monitor, this patient would be dead, that this 10-year flat time providing zero returns is attributable to any market condition, whether it's equity, bond, currency, or otherwise. So there's no other inference that can be drawn under the circumstances. Again, what's critical... But the volatility control reductions were disclosed, right, in the marketing literature? The volatility control deduct control overlay was disclosed in a generic way. But in the very same section of the SOU, it said that and represented that this would provide the opportunity to receive index credits, i.e. positive return, in times when independent crediting options based on equity or bond markets would not. And that simply is untrue. It's false. It's never happened over the last 10 years. And so, yes, the volatility control overlay is disclosed in a generic way, but there's a corresponding affirmative misrepresentation concerning what the volatility control overlay would produce, which is the ability to earn returns even when markets were down. That's never occurred. I would point out that we're talking here about plausibility. We're entitled to inferences in our favor. You have not only that, but the case law makes clear that plausibility does not mean proof. It does not mean probability. Even if a court is skeptical whether plaintiffs will, with the benefit of discovery, be able to prove our claims, that doesn't undermine plausibility. Here, taken as true as the pleading standards require, complaint alleges facts showing that the indices have produced zero returns for nearly a decade, while traditional indices have skyrocketed. The allegations specifically show that the chronic underperformance is a direct result of a host of specific undisclosed practices and hidden charges. And moreover, we have alleged specifically that the very same practices, volatility control, promises of uncapped returns, use of a 10-year look-back, have been identified as potentially misleading by Iowa Insurance Commissioner, by NAIC, by other insurance companies who have decried these types of products, and by the financial analysts. Mr. Friedman, your time has expired. Okay. Thank you, Your Honor. Does any member of the panel have a question? Okay. Mr. Phillips? Thank you, Your Honor. May it please the Court, Robert Phillips for Security Benefit Life Insurance Company. We submit that the district court's order is well-reasoned, thorough, and should be affirmed. First Amendment complaint is lengthy, but it really doesn't, in this context, allege sufficient facts to sustain the claim. Many of these conclusory allegations regarding underperformance or something being allegedly misleading are at odds with the operative documents which were judicially noticed. We will concede that the judicially noticed documents here are unusually voluminous, but they are all properly considered by the court. We know from well-established 10th Circuit law that allegations that contradict a properly considered document need not be accepted as true. That's really at the heart of what the district court did here. The plaintiff's core theory that my client designed these products to perform poorly simply isn't plausible. If you go back to Twombly and look at the notion of an obvious alternative explanation for performance or for the behavior, this is a product that was designed to have a counter-cyclical function as an alternative to equity indexes. It happened to be interviewed just at the time that we were coming out of financial crisis, and equity indexes had bottomed out. As it turned out for these appellants in the first five-year period, their timing was simply bad. That's the alternative obvious explanation. That's why the basis, at least the basis of part of your argument, that these allegations of fraud are implausible, and I think Judge Teeter recognized this because of the economic downturn, right? That's right. So where in the allegations in the complaint or the incorporated brochures that we judicially notice as incorporated in the complaint, have the plaintiffs attributed the losses for these individuals to the economic downturn? We're on a 12 v. 6. I understand. They have not alleged that these losses are attributable to the economic downturn. So Judge Teeter was relying on your arguments, not crediting the allegations of the complaint in the light most favorable to the plaintiff, right? Well, I think the district court certainly had the opportunity and obligation to consider this record to see if there is an obvious alternative explanation for this particular index. Keep in mind, it's not all of the annuities, because people who chose other returns, but whether this one index performing poorly over a five-year period, whether there is some plausible explanation for that other than nefarious conduct. We submit that the index was not manipulated. The index was what it was. The numbers were what they were. The market behavior during that time ended up being that if you had chosen the bucket for an equity index and stock market-based returns, you would have done very well. Let me ask you this. Let's say I'm going to create my own Bob Bacharach proprietary index fund, and I have a computer program, and then I go and look at every combination of stocks, and I set a criteria. I don't know if it's possible to do this in the world of technology, but I'm guessing it is, and say, okay, go find over the last 10 years what combination of stocks will yield the most astronomical returns, because I'm going to start in 2022 with this Bob Bacharach proprietary index fund, so there's not going to be a history that a prospective investor can look at, but then I take that, and I say, oh, well, I'm just going to have these illustrations. I'm going to use these neutral time periods. I'm going to say, okay, well, 10 years, that's objective, and then I'm going to project that over the next 10 years, and it just so happens that it's going to make every investor like say a 38% annual return or cumulative return over 10 years, something very impressive. The criteria for the illustrations are going to be objective, but the problem that your opposing counsel is identifying is the illustrations are only to illustrate the backcasting period, which is all cherry-picked in order to find periods over the last 10 years that are going to show a combination that is going to collectively show these astronomical returns. Why isn't that at least a plausible theory? Well, first of all, there's no basis for a claim that they were cherry-picked, and if you look at the underlying materials, they're using real numbers. I think the argument really being made is that using those numbers from that time period would not be a realistic basis to project performance going forward, but look at what the actual illustrations say. There's no actual falsity there. That's what Judge Teeter observed. The illustrations are clearly hypotheticals. They offer several different scenarios, and they have the clear disclaimer right up front that none of these scenarios are even estimates of likely actual returns. Why did you all put them in there in the first place? To depict different hypothetical scenarios, and again, as Mr. Friedman pointed out, these illustrations are governed by state regulation. The formatting and the statement of assumptions and the like are all governed by state regulation. Mr. Phillips, on the point about state regulation, how do the industry criticisms of backcasting figure into our analysis or our review of plausibility? Wouldn't that support the plaintiffs here? I don't believe so, Your Honor. Industry criticism, which frankly came from competitors who might have been losing market share... I thought it was regulators. Isn't that right? There was one regulator in Iowa who said that the use of the backcasting might be misleading. There was no suggestion of fraud, no suggestion that the actual illustrations violated Iowa regulation. So we need to look at these illustrations for what they are and how they're governed by regulation. They are hypothetical scenarios. Let me ask you, Coyte. I misunderstood something. You said these are hypothetical. I'm not quite sure what that means. I thought that the illustrations looked at what this particular index would have produced in for an investor if the investor had purchased the investment at a certain date and got rid of it or looked at the earnings after a 10-year period. They had different 10-year periods, but I thought they were based on objective data. You have an index and it has a formula for how the index is invested. These illustrations were what you would have made if this index had been in effect in a prior year. No, that's not what they were? No. The illustrations are presented at the point of sale with various assumptions stated and with at least three different scenarios depicted. One could easily describe them as low, medium, and high. There are disclaimers about the notion that these are hypothetical, projecting forward over time as to how things might play out. And what was the data? What was the hypothetical data? Did it say if the Dow Jones Industrial Average goes up by 30 percent and this index goes up such and such, then you would expect this return on this investment? Is that what they said? If they're going to be hypothetical, don't they have to say what their assumptions are? That is the general concept, and embedded in those assumptions are participation rates and other factors that create a differential between the actual index performance in a particular year and the amount of credit that goes to the account value based upon the performance of the index. So, can you describe briefly one of the assumptions for one of the hypotheticals? Certainly, there would be an assumption, for example, that you have an average credited return of four percent per year for X number of years in your illustration. And you might have one that assumes an average of six percent per year credited to the account. And then you would have one on a guaranteed basis saying you will do no worse than this no matter how poorly the index performs in any given year. And those scenarios are presented to the applicant for the annuity at the time of sale. Were there any illustrations of how this index has performed in the past? I thought there were some illustrations that said if for this particular 10-year period, the index would have produced this sort of return over this 10-year period. It would have produced this rate of return. Were there not other materials? That was the backcasting depiction that was created because these were new indices. But those were not part of the forward-looking illustrations, which are the heart of the fraud claim here. And we submit, and Judge Teeter agreed, that there is no basis for a fraud claim here, simply looking at the documents that have been judicially noticed. Well, I thought there was a claim of fraud with respect to the backward-looking returns based on the allegation that the index was cherry-picked so that it would produce the investments. The way the index was computed was cherry-picked in the sense that given the performance of various investments, the index was designed to give the highest possible return. So, if an investment did poorly in the prior 10 years, it would be considered in the index. But if it did very well, it would be given in the index and given high weight. I thought that was the cherry-picking allegation. Again, there are two different concepts here. One was the issue about the depiction of past performance. That's different than what was depicted in the illustrations. The past performance, you don't refer to the references to past performance as illustrations. How is past performance represented? Those were depictions of the design of this proprietary index based upon history, actual numbers based upon history, but untethered to the sales representations contained in the illustrations, which were entirely forward-looking and had stated assumptions with respect to hypothetical market performance of the components of a particular index. For example, remember Mr. Weber, who split his allocation between 50% ALTBI, the primary focus of the criticism here, and the TVBI, which actually returned 25% for it. Different components, they were all subject to the same sort of illustration projections, but one index performed reasonably well and the other didn't. It doesn't mean that there was something fraudulent about the forward-looking illustrations. Things turn out differently than a particular hypothetical scenario might depict at the inception of the period. That's all we're really talking about here. Were there any illustrations over the cumulative 10-year period where the S&P 500 outperformed the theoretical look-back over the 10-year period for those two proprietary index funds? It did 100%, in other words, of the two proprietary index funds that outperformed the S&P and all of the major indexes over that 10-year period. I don't know about all of the major indexes. There were certainly some depictions showing better performance than the S&P. Speaking of the S&P 500, do you recall whether every single of those illustrations showed outperformance of the S&P 500 over 10 years? Well, again, I would take exception to the use of the word illustrations with respect to the backcasting. The visual aid. The visual aids. Right. I didn't mean anything pejorative. Yeah. That's certainly true with the S&P and I believe at least one other equity mix. I would agree with that. My disagreement with opposing counsel has to do with the consequences of that and whether there was any falsity involved in those depictions. I see. Thank you. Any other questions by the panel? Thank you. Thank you, Mr. Phillips. Your time has expired. And I think Mr. Friedman's time had expired as well. So, case is submitted. Counselor excused.